Filed 10/23/24  P. v. Smith CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C095786 |
| Plaintiff and Respondent, | (Super. Ct. No. 20F7464) |
| v. | |
| TRISTON LEE SMITH, | |
| Defendant and Appellant. | |

A jury found defendant Triston Lee Smith guilty of four counts of oral copulation with a child under the age of 10 years and one count of lewd act with a child under the age of 14 years by use of force.  The trial court sentenced defendant to state prison for 5 years plus 60 years to life.

On appeal, defendant contends:  (1) the trial court prejudicially erred in admitting his statements to law enforcement because they were involuntary and made without an advisement under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*); (2) the evidence was insufficient to support the jury's findings that he intentionally engaged in oral

1

copulation or that he used force in committing the lewd act; (3) the trial court prejudicially erred in failing to instruct the jury on the general intent requirement as to the oral copulation counts; (4) the trial court prejudicially erred in admitting a hearsay statement; and (5) the trial court abused its discretion when it decided to impose consecutive sentences on all counts.

We agree with defendant and the People on appeal that the trial court erred in imposing consecutive sentences on all counts but reject the rest of his contentions. The matter is remanded for the limited purpose of resentencing. The judgment is otherwise affirmed. Undesignated statutory references are to the Penal Code unless otherwise indicated.

FACTUAL AND PROCEDURAL BACKGROUND

A.      *Background*

Defendant lived with his girlfriend and her five young children. Defendant helped care for the children and started bathing the children when girlfriend's second child was about three or four years old. Bathing at the household was like an "assembly line," with defendant in the bathroom washing two or more children at one time and girlfriend either brushing the children's hair in the bathroom or drying them off in the bedroom. Defendant and girlfriend usually washed the oldest 4 children within 20 minutes. During the bathing process, defendant was also naked and showered with the children, but the bathroom door was open, and girlfriend could see the whole bathroom from the bedroom.

B.      *The Investigation*

Sergeant Regan Ortega at the Redding Police Department received a report from the Shasta County Child and Family Services that child was forced to orally copulate defendant. Sergeant Ortega arranged for a child forensic interviewer, Tracy Ojakangas, to interview child (the forensic interview). During the forensic interview, child stated that defendant's penis had been in her mouth.

2

Defendant agreed to go to the police department to discuss his interactions with the children. At the police department, defendant spoke to Sergeant Regan Ortega (the first Ortega interrogation), participated in a polygraph examination with Chad Russell (the Russell interrogation), and then spoke to Sergeant Ortega again (the second Ortega interrogation). During the Russell interrogation and the second Ortega interrogation, defendant stated that his penis had been in child's mouth. Defendant returned home after the interrogations but was arrested several hours later.

The People charged defendant with four counts of felony oral copulation of a child 10 years or under (§ 288.7, subd. (b), counts 1-4; the oral copulation counts) and one count of felony forcible lewd act upon a child 14 years or under (§ 288, subd. (b), count 5; the forcible lewd act count).

C.     *Trial Court Proceedings, Verdict and Sentencing*

In additional to other evidence, the trial court admitted the video of the entire forensic interview, Sergeant Ortega's testimony describing the first Ortega interrogation, the audio recording of the postpolygraph portion of the Russell interrogation, and a portion of the second Ortega interview.

A jury found defendant guilty of all counts. The trial court sentenced defendant to a determinate low term of 5 years for the forcible lewd act count, plus consecutive indeterminate terms of 15 years to life for each of the oral copulation counts, for a total of 5 years plus 60 years to life in state prison.

DISCUSSION

I

*Admission of Statements to Law Enforcement*

Defendant contends that: (1) the interrogation turned custodial once Russell connected him to the polygraph machine, and all his statements made during the Russell interrogation and the second Ortega interrogation should be suppressed for *Miranda* violations; and (2) the interrogation became involuntary when he was connected to the

3

polygraph machine, and his incriminating statements made thereafter were inadmissible. We disagree.

*A.     Additional Background*

Sergeant Ortega went to defendant's residence and asked if defendant would go to the police department to discuss his interactions with the children.  Defendant agreed.

1.  The first Ortega interrogation

When defendant arrived at the police department, he was brought to an interview room.  Sergeant Ortega offered defendant snacks and coffee, informed him that the door was unlocked, and thanked defendant for coming.  She further informed defendant that he was not under arrest: "Like I said, the door's unlocked.  Um, you're not under arrest at all, you're free to leave whenever you want, I just wanna have a conversation with you, and kind of get things squared away."

During this interrogation, defendant stated he did not know that child claimed he put his penis in her mouth and denied it ever happened.  Sergeant Ortega asked defendant if he "would be interested in" taking a polygraph test "just to prove that" he had never done it.  Defendant responded:  "I mean, if that helps me, yeah."  Sergeant Ortega confirmed:  "Absolutely, it would help you.  It would clear your name 100%."  Defendant agreed to take the polygraph test.

This interrogation lasted one hour and fourteen minutes.  After it ended, defendant was offered water and snacks.

2.  The Russell interrogation

Defendant walked into the polygraph examination room with polygraph examiner Russell and Sergeant Ortega.  Russell asked defendant to sign a polygraph agreement form because Russell had to touch defendant and put the polygraph machine components on defendant.  Russell stated he would read the agreement to defendant "word for word" and defendant may also read it himself.  Russell then proceeded to read the agreement to defendant, as pertinent here:  "I . . . do hereby voluntarily consent to be examined by the

4

polygraph . . . I've had the detail[s] of this examination explained to my satisfaction and voluntarily give my permission for the necessary polygraph accessories to be attached to my body. I further understand that I have the right to refuse to answer any question if my answer to that question would tend to incriminate or degrade me. If I start this examination, I may stop at any time . . . I have read this agreement form and completely and fully understand its contents." Defendant confirmed he understood the agreement and he did not have a problem with Russell attaching the polygraph machine components to him. Russell then directed defendant to sign and date the agreement, and again told defendant that he could read the agreement on his own.

After defendant signed the agreement, he asked Sergeant Ortega how he was going to get home. Ortega chuckled and said: "We'll make sure you get home. Not a problem. We are not gonna make you walk." Her response made both Russell and defendant laugh. Sergeant Ortega then thanked defendant again and left the room.

Russell started to confirm defendant's information as they continued to make small talk. Defendant told Russell he was tired because he had only three hours of sleep the night before, that he was sick with strep throat, and that he was having diarrhea.

After confirming defendant's information, Russell started to explain the polygraph test to defendant. Defendant interrupted and requested to use the restroom. Russell immediately stopped and let defendant out of the polygraph examination room as soon as he confirmed the restroom was vacant.

After defendant returned from the restroom, Russell resumed the explanation and stated that he would go over all questions on the test with defendant before the test started so "there's not gonna be any surprises, there's not gonna be any tricks."

Their conversation turned to child's accusation and defendant repeatedly denied it ever happened. At the end, Russell told defendant his observations: "[Y]ou seem just kind of really flabbergasted by the whole accusation and, and it sounds like your family

5

supports you and believes you. So that, that makes me feel better, uh, Detective Ortega felt good about the interview."

Russell next explained criminal profiling. He used homicide as an example, stating the profile of a person who commits homicide usually includes hurting or harming animals in the past and violent prior convictions such as domestic violence or robbery. He then asked defendant to choose a likely homicide suspect between two people, the first has prior convictions for fraud, forgery, marijuana, and shoplifting, while the second has prior convictions for robbery, domestic violence, and animal cruelty. Defendant correctly chose the second suspect based on the suspect's history of hurting animals and domestic violence.

Russell then stated there are three main traits of the profile of a child molester, but he assured defendant: "I don't think you fit the profile of a child molester, at all, not even close. I've been in rooms with child molesters, I've interviewed hundreds of child molesters, you don't fit the profile of a child molester to me. . . . [I]n fact, I'm going on record saying that I know you haven't done any of these three things." Russell said he nevertheless must ask defendant the three profiling questions because he had to determine whether defendant put his penis in child's mouth and whether defendant fit the profile of someone who would do that. Russell explained: "Because you're in the house with a lot of young kids, obviously we don't wanna put somebody that would fit the profile of somebody like that back in a house with a bunch of young children, right?" But he again said: "So, please don't take it personal, I know you haven't done these things, so I don't want you thinking, 'Oh he, he accused me.' I'm not accusing you of any of these three things. I'm telling you I know you haven't done them." Russell proceeded to ask

defendant the three profiling questions, and defendant denied all of them.[1]  While answering the questions, defendant said he "get[s] things mixed up a lot," "get[s] confused sometimes," and failed his driver's license test 17 times.

After the profiling questions, Russell offered defendant a cigarette break. Defendant returned from the break about 20 minutes later and waited for another 11 minutes for Russell to enter the room.  When Russell entered the room, defendant told Russell he was cold and Russell turned the heat up.

Russell started reviewing all the questions with defendant and reassured him that he would not ask any surprise questions or trick questions during the test.  He also told defendant that the "most important thing" is for defendant to "sit still during the test" because "[a]ny movements during the test can make you look deceptive."  He further instructed defendant:  "So, all I need you to do when we do the actual test is, you're gonna be sitting with your feet flat on the ground . . . arms are gonna be at your side. You'll have one arm in your lap, one arm on the table.  You're gonna be looking straightforward right here, listening to the questions carefully, answering them truthfully with just a simple yes or no. . . don't be looking around the room, don't readjust your seat . . . don't even wiggle your fingers or toes because any movements during the test can make you look deceptive, and I don't want you failing this test just because you couldn't follow instructions, all right?"  Defendant stated it was really hard for him to sit still, but Russell told defendant he must "sit still on this test with no problems because you know how much you have riding on it."  They then went over all the questions on the test, including questions about whether defendant's penis had ever penetrated child's mouth, which defendant denied.

---

[1]  The questions were:  (1) whether defendant had a history of fantasizing about sexual activity; (2) whether defendant had ever done anything sexually that he was ashamed of; and (3) whether defendant ever lied about any sexual activity.

Russell connected the polygraph machine components, including the blood pressure cuff, to defendant and explained each component's function to him. After all components were attached to defendant, Russell inflated the blood pressure cuff and performed a pre-test on defendant to make sure that defendant could follow instructions during the actual test. When Russell asked defendant to pick a number for the pre-test, defendant expressed concerns about being "tricked." Russell assured defendant that "nothing about this is a trick." Defendant complained the blood pressure cuff hurt his arm, Russell acknowledged that but stated it would not cause any injuries. Defendant also said his vision went black and he had to blink to get his vision back to normal. Russell told defendant to make sure that he blinks.

They proceeded to conduct the polygraph test with Russell sitting behind defendant. The questions were the same as those Russell previewed with defendant, and defendant again denied his penis had ever penetrated child's mouth. At the conclusion of the test, Russell removed the polygraph machine components from defendant and left the room. Before Russell left, he thanked defendant and offered him another cigarette break. Defendant went on the break for about 10 minutes, and Russell returned to the room several minutes after defendant's return.

Russell told defendant that he failed the questions on whether his penis ever penetrated child's mouth. Russell presented his theory on the failure: "I think that [child] is very much in love with you and what, what she interprets [is] love, because it kind of sounds like before you came along her life was a shit show, right? And I suspect that she has observed, um, showing of affection from other people, maybe her mother with a previous person, or with other people that she stayed with or whatever. And I think . . . I'm just guessin', I'm not there, but I suspect she probably follows you around at home like a little puppy dog or wants to do everything that you're doing. Um, and that she is very happy to have you in her life. And that her, what she feels her way of showing affection or love is to try and replicate some of the things that she's seen before.

8

So I'm gonna tell you what I think has happened. I think that while you guys were in the shower I think, I [personally think] that she has taken your penis and put it in her mouth and that you were afraid or did not want to say anything to her mother because you were afraid that she was going to get in trouble. I think that this, she has done this multiple times and I'm sure that you've corrected her on this, but you can't keep covering for her at this point. You need to be upfront with what has happened. So talk to me."

Defendant admitted: "She's done it a couple times . . . I've – I've corrected her." He also estimated this happened three or four times. But defendant denied grabbing child's head and making her go further down on his penis. When asked why he told the truth, he pointed at the polygraph machine and stated: "There's no – goin' back on it."

At the end of the conversation, Russell told defendant: "[S]o here's what I would like to do if – if you're okay with this. Um, I would like to try and get a hold of [Sergeant Ortega] and – 'cause I'll be honest . . . I don't want to be the one to tell her the truth. Um, I would rather you told her the truth." He further asked defendant: "Is that something you would be willing to do? Or do you want me to do that?" Defendant responded: "I'll go ahead and tell her."

The questioning portion of the Russell interrogation lasted almost two hours.

3. <u>Second Ortega interrogation</u>

Defendant told Sergeant Ortega at the outset that child had his penis in her mouth, but child stopped after he corrected her. Ortega thanked defendant for his honesty and proceeded to ask some "clarifying questions."

As the interrogation continued, defendant stated child put his penis in her mouth four times before he stopped showering with her. Defendant denied grabbing the back of child's head and putting his penis in her mouth. Sergeant Ortega asked defendant: "Where would she get it from that you grabbed the back of her head and guided her mouth onto your penis?" Defendant said he had no clue, but Sergeant Ortega was not convinced: "Do you think she's making that up?" When defendant continued to deny,

9

Sergeant Ortega said: "But you did. We're beyond that. We already know what happened. We've talked to [child]. You've already come this far. You've already admitted to the hard part of this and that's extremely commendable of you. She loves you. She cares about you. All your kids do. You need to do this for [child]. You need to be completely honest to help that little girl. She's the sweetest little thing. And you owe that to her." After several rounds of back and forth with Sergeant Ortega, defendant made additional incriminating statements that the trial court suppressed (and are not at issue here).

The questioning portion of the second Ortega interview lasted for about 48 minutes. Defendant was driven home at 3:21 pm.

4. Trial court proceedings

Defendant moved in limine to exclude his statements to Sergeant Ortega and Russell on the grounds that those statements were obtained in violation of his Fifth Amendment rights under *Miranda*, that his statements were involuntary, and that the admission of the statements violated due process under the Fourteenth Amendment.

At the Evidence Code section 402 hearing, a director in special education testified that defendant was identified in ninth grade as having a learning disability and attention deficit, requiring special education. Defendant also has a below average IQ, but he has average verbal comprehension and perceptional reasoning skills. The director opined that defendant's learning disability manifested in challenges with reading, writing, decision making, and memory recall. The director further noted that defendant was diagnosed with auditory disability, meaning he has difficulty processing information that he hears. Someone with defendant's disabilities is "potentially" more likely to agree with things said by those in a position of authority.

The trial court found defendant's disabilities had no impact on the interrogation because it was "strictly a verbal exchange where he rates normal" and the transcript showed defendant understood what was happening.

10

The trial court found defendant was subject to interrogation from the beginning but found the first Ortega interrogation and the Russell interrogation noncustodial. It further found defendant's confession during the Russell interrogation voluntary.

However, the trial court found the second Ortega interrogation turned custodial when Sergeant Ortega refused to accept defendant's claim that he never grabbed child's head and put his penis in her mouth, and questioned defendant how child could get that idea otherwise. The interrogation after this point was not provided to the jury.

B.      *Miranda Advisement*

Defendant contends the Russell interrogation became custodial once he was connected to the polygraph machine. We disagree.

1.   General principles

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." (*Miranda, supra*, 384 U.S. at p. 444.)

"Custodial interrogation" is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda, supra*, 384 U.S. at p. 444.) "The question whether defendant was in custody for *Miranda* purposes is a mixed question of law and fact." (*People v. Ochoa* (1998) 19 Cal.4th 353, 401.) "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." (*Thompson v. Keohane* (1995) 516 U.S. 99, 112, fn. omitted.) "Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve 'the ultimate inquiry': '[was] there a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' " (*Ibid.*)

11

Circumstances relevant to whether a reasonable person in the defendant's position would have felt he or she was not at liberty to leave include "whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation." (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162.) "No one factor is dispositive. Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*Ibid.*)

"On review of a trial court's decision on a *Miranda* issue, we accept the trial court's determination of disputed facts if supported by substantial evidence, but we independently decide whether the challenged statements were obtained in violation of *Miranda*." (*People v. Davis* (2009) 46 Cal.4th 539, 586.) We also independently review the facts surrounding an admission or confession to the extent the interview is tape-recorded. (*People v. Linton* (2013) 56 Cal.4th 1146, 1177.)

2. Analysis

In *Ochoa*, the defendant voluntarily agreed to a polygraph test after the police told him they would leave him alone if he passed the test. (*People v. Ochoa, supra*, 19 Cal.4th at p. 393.) Before the polygraph test, the defendant signed a waiver stating that the polygraph test was voluntary and that he was not required to say anything relative to the case, but he was not given a *Miranda* advisement. (*Id.* at pp. 392, 402.) Our Supreme Court concluded "a reasonable person in defendant's position would have realized that he could end the questioning and leave" and noted the waiver was "[m]ost important" to their conclusion. (*Id.* at p. 402.) It also rejected defendant's argument that he was not free to leave once he was connected to the polygraph machine because "the waiver told him clearly that the interview was voluntary, and . . . he knew he did not have to take the examination." (*Id.* at pp. 402-403.)

Here, as in *Ochoa*, a reasonable person in defendant's position would have realized that he could terminate the polygraph test at any time and leave. Defendant does not dispute he voluntarily agreed to the polygraph test. Russell read the polygraph agreement to defendant "word for word" and twice told defendant that he could read the agreement on his own. The agreement stated in pertinent part: "I've had the detail[s] of this examination explained to my satisfaction and voluntarily give my permission for the necessary polygraph accessories to be attached to my body. I further understand that I have the right to refuse to answer any question if my answer to that question would tend to incriminate or degrade me. If I start this examination, I may stop at any time." Defendant confirmed he understood the agreement and signed it. Thus, even though defendant was connected to the polygraph machine, he agreed to the connection voluntarily and understood that he could request to be disconnected at any time. Russell's instructions that defendant must "sit still" with "one arm in your lap, one arm on the table" and "look[] straightforward," "don't be looking around the room, don't readjust your seat," "don't even wiggle your fingers or toes" were given to ensure the

13

polygraph test results were accurate, not to prevent defendant from leaving. As Russell explained, "any movement during the test can make [defendant] look deceptive."

We find no indication that defendant was unable to understand the polygraph agreement due to his lack of sleep, below average IQ, or difficulties in processing information. Defendant has average verbal comprehension and perceptional reasoning skills, and our review of the interrogation videos does not reveal that defendant had any difficulties understanding Sergeant Ortega or Russell. In fact, after Russell explained the concept of criminal profiling to defendant, defendant quickly and correctly identified the suspect with traits matching the profile of a likely homicide offender in the hypothetical Russell gave him.

Defendant's expression of nervousness did not turn the Russell interrogation custodial. As the Russell interrogation went on, defendant stated that he was cold, that the blood pressure cuff hurt him, and that his vision had gone black, and he expressed concerns about being tricked. But Russell addressed each of defendant's concerns immediately. He turned up the heat, acknowledged the blood pressure cuff was uncomfortable but assured defendant it would not cause any injuries, told defendant to keep blinking to keep his vision normal, and ensured defendant that nothing about the polygraph test was a trick. And despite expressing his discomfort and concerns, defendant never requested Russell to stop.

We accept that the polygraph questions regarding whether defendant's penis had ever penetrated child's mouth were accusatory. However, Russell asked these questions in a flat, emotionless, and nonaccusatory tone as he sat behind defendant and administered the polygraph test. Defendant was also advised by the agreement that he could refuse to answer any incriminating questions and terminate the polygraph test at any time. Thus, the questions were insufficient to convert the voluntary polygraph test into custody. (See *People v. Moore* (2011) 51 Cal.4th 386, 402-403 [accusatory questions including whether the defendant burglarized the house, "with no other evidence

14

of a restraint on the person's freedom of movement, are not necessarily sufficient to convert voluntary presence at an interview into custody"].)

We reject defendant's contention that Russell told defendant he could not go home if he failed the polygraph test. It is true that before previewing the profiling questions for a child molester, Russell told defendant the police would not put someone who fit the profile back to a home with young children such as defendant's. But more importantly, Russell told defendant: "I don't think you fit the profile of a child molester, at all, not even close . . . . [I]n fact, I'm going on the record saying that I know you haven't done any of" the things fitting a child molester's profile. He also asked defendant not to take the child molester profiling questions "personal" and assured defendant he was not accusing defendant of doing any of the things in the questions. A reasonable person would have understood these statements to mean that Russell did not believe defendant fit the profile of a child molester but he was required to ask the profiling questions during the polygraph test out of an abundance of caution.

Russell's postexamination interview was also not tantamount to a custodial interrogation. Russell told defendant that he failed the questions on whether his penis had ever penetrated child's mouth and offered defendant his theory on what happened: "I'm just guessin', I'm not there, . . . I [personally think] that she has taken your penis and put it in her mouth . . . I'm sure you've corrected her on this. But you can't keep covering for her at this point. You need to be upfront with what has happened. So talk to me." This was not a repeat rejection of defendant's denial, and Russell did not confront defendant with evidence against him. Russell merely informed defendant of the unfavorable polygraph test results and asked defendant for an explanation. At no time did Russell prevent defendant from leaving. (See *People v. Rich* (1988) 45 Cal.3d 1036, 1077 [postpolygrah interview was not tantamount to a custodial interrogation when the defendant stated he wanted to leave but the examiner asked him to stay and discuss the case because at no time did the examiner prevent the defendant from leaving].) In fact,

15

"it would have been unreasonable for [defendant] to assume that [he] would not be informed of the polygraph readings and asked to explain any unfavorable result." (*Wyrick v. Fields* (1982) 459 U.S. 42, 47.)

We disagree with defendant's assertion that *People v. Aguilera, supra*, 51 Cal.App.4th 1151, in which the court reversed a conviction on grounds of a *Miranda* violation, requires the same result here. Russell's conversation with defendant was different than the "intense, persistent, aggressive, confrontational, accusatory, and, at times, threatening and intimidating" questioning there. (*Id.* at p. 1165.) In *Aguilera*, the court found a reasonable person under the circumstances there would have felt deprived of liberty in a significant way because the officers told defendant "*[w]e're not gonna let you leave* here until we go talk to the girl, and she's not gonna be able to confirm the story." (*Id.* at pp. 1160, 1163.) Moreover, "[t]he officers rejected [the defendant's] story, calling it 'bullshit' and accusing him of fabricating an alibi . . . . They told him not to 'play games' and confronted him repeatedly with incriminating evidence . . . . They falsely suggested they had his fingerprints from one of the cars." (*Id.* at p. 1159.) These facts are notable unlike the facts of our case.

The time defendant spent at the police department (almost six hours) is lengthy and lends to a finding of custodial interrogation, but it is not dispositive. Defendant agreed to go to the police department and consented to each additional stage of the interrogation. He was also given multiple breaks during the interrogation. In light of the other circumstances discussed above, we do not find the length of the interrogation indicative of custody.

C.     *Voluntariness*

Defendant contends that "the interrogation became involuntary during the polygraph examination, at the same time that the *Miranda* advisement was required . . . because at that time the circumstances of the interrogation had become coercive." We disagree.

16

1. General Principles

The due process clause of the Fourteenth Amendment "makes inadmissible any involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion." (*People v. Neal* (2003) 31 Cal.4th 63, 79.) "A statement is involuntary if it is not the product of ' "a rational intellect and free will." ' " (*People v. Maury* (2003) 30 Cal.4th 342, 404.) "Whether a statement is voluntary depends upon the totality of the circumstances surrounding the interrogation." (*People v. Smith* (2007) 40 Cal.4th 483, 501.) These circumstances include "any element of police coercion, the length of the interrogation and its location and continuity, and the defendant's maturity, education, and physical and mental health." (*People v. Peoples* (2016) 62 Cal.4th 718, 740.) "A defendant's 'inexperience' and 'low intelligence' may weigh against a finding of voluntariness, as do 'deprivation and isolation imposed on [the] defendant during his confinement.' " (*People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 21.) But "[i]nsofar as a defendant's claims of involuntariness emphasize that defendant's particular psychological state rendered him open to coercion," our Supreme Court "has noted that 'the Fifth Amendment is not "concerned with moral and psychological pressures to confess emanating from sources other than official coercion." ' " (*People v. Smith*, at p. 502.) Thus, courts have declined to find police coercion where the record does not show the police exploited any personal characteristics or vulnerabilities of defendant in order to obtain his confession. (*Ibid.*; see *People v. Linton, supra*, 56 Cal.4th at pp. 1178-1179 [finding no coercion when no evidence showed that the police officers exploited the defendant's learning disabilities, mental illness, immaturity, youthfulness, lack of education, or lack of experience with the criminal justice system to obtain a confession].)

On appeal, we review independently the trial court's determination as to the voluntariness of a confession "in light of the record in its entirety, including 'all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.' " (*People v. Benson* (1990) 52 Cal.3d 754, 779.) "When testimony in the

record is conflicting, we ' " 'must "accept that version of events which is most favorable to the People, to the extent that it is supported by the record." ' " ' " (*People v. Miranda-Guerrero, supra*, 14 Cal.5th at p. 20.)

2. <u>Analysis</u>

Here, we find no police coercion when defendant was connected to the polygraph machine. As stated above, prior to the polygraph test, Sergeant Ortega thanked defendant twice for coming to the police department, told defendant he was free to leave at any time, and joked with defendant. As defendant concedes in his opening brief, Sergeant Ortega's tone during the first interrogation was "cordial and non-threatening." In this context, defendant consented to the polygraph test and to have the polygraph machine components attached to him. Russell also repeatedly expressed his confidence in defendant's innocence based on his observation and experience, noting defendant's family believed and supported him, and asserting he did not think defendant "fit the profile of a child molester, at all, not even close." Although the interrogation lasted almost six hours, defendant was provided with food, drinks, and breaks. (See *People v. Peoples, supra*, 62 Cal.4th at pp. 740-741 [finding a 12-hour interrogation did not amount to coercion where defendant was provided with food, drinks, and breaks upon request].)

When Russell told defendant he failed the polygraph test, he did not confront defendant in an aggressive, hostile, or threatening tone. Instead, he explained his theory of the failure to defendant in a calm, understanding manner, while conceding he was uncertain about the accuracy of his theory: "I think – I'm just guessin', I'm not there . . . I think – I [personally think] that she has taken your penis and put it in her mouth." Russell did urge defendant to "be upfront with what has happened" but "[t]here was nothing coercive in the officers urging defendant to tell the truth." (*People v. Linton, supra*, 56 Cal.4th at p. 1178.) As soon as Russell finished with his theory, defendant confessed without delay. Ultimately, defendant admitted failing the polygraph test prompted him to tell the truth.

18

Defendant contends he was at a greater risk for falsely confessing due to his low intelligence, cognitive disability, illness, and unsophisticated nature. But these characteristics do not support a finding of police coercion when nothing in the record shows either Sergeant Ortega or Russell exploited them to obtain a confession. (See *People v. Linton, supra*, 56 Cal.4th at pp. 1178-1179.)

In light of the circumstances, we conclude defendant's confessions during the Russell interrogation were voluntarily made.

Defendant also contends that the statements he made during the second Ortega interrogation should be suppressed because it was a continuation of the Russell interrogation. But a portion of the second Ortega interrogation has already been suppressed, and defendant does not argue any of the unsuppressed portion was involuntary or required a *Miranda* advisement independent of the Russell interrogation. He also provides no record citations as to the portion of the second Ortega interrogation that he finds problematic. Having concluded the Russell interrogation was not custodial and defendant's confessions made therein were voluntary, we do not make argument or scour the record for defendant concerning the propriety of the statements he made during the second Ortega interrogation. In any event, the unsuppressed portion of the second Ortega interrogation contained effectively the same confessions from defendant as in the Russell interrogation. Suppressing these statements would be pointless in light of our conclusion that defendant's statements to Russell were admissible.

## II

### *Admission of Hearsay Evidence*

Defendant contends the trial court prejudicially erred in admitting the entire forensic interview of child without removing child's recount of an inadmissible hearsay statement she made to a social worker. Anticipating a forfeiture argument from the People, he also contends he received ineffective assistance of counsel. We review

defendant's claim on its merits to forestall ineffective assistance of counsel arguments (*People v. Crittenden* (1994) 9 Cal.4th 83, 146) and find no error.

## A.   Additional Background

During the forensic interview, Ojakangas asked child what she wanted to talk about and child responded:  "You mean about penis?"  When asked what happened with the penis, child mentioned defendant.  Child told Ojakangas that defendant "wanted me to suck on" his penis so she "bit it on there."  Ojakangas asked child if she remembered what she told the social worker about defendant's penis.  Child said she told the social worker that defendant "put his hand on my head [putting one hand on her head] . . . and I shut my eyes and open my mouth like this [using one hand to squeeze her mouth open] . . . And I put his penis in my mouth."  Ojakangas followed up:  "So I heard you say that [defendant] put his hand on your head [putting both hands on her head] and . . . then he went like this [using one hand to squeeze her mouth open] with your mouth?"  Child answered:  "Yeah.  After . . . I shut my eyes."  Ojakangas continued:  "After you shut your eyes.  And then he put his penis in your mouth?"  Child responded affirmatively, adding that she felt hair in her mouth and it tasted like bathroom salt.

Defense counsel initially moved in limine to exclude child's statement to the social worker on the grounds that it was a hearsay statement and did not fall under the fresh complaint doctrine or the spontaneous statement exception.  The trial court tentatively ruled to limit the statement to the name of the perpetrator and the general nature of the allegations under the fresh complaint rule, and to instruct the jury not to consider the statement for the truth of matter asserted.  But this issue was subsequently found moot when the prosecutor stated she would not call the social worker as a witness.

Defense counsel also moved in limine to exclude the video recording of the entire forensic interview on the ground that it lacked the requisite indicia of reliability under Evidence Code section 1360, subdivision (a)(2).  At the hearing, the trial court stated that, after reviewing the transcripts and the video, it found:  "When the indication came up

20

about why are we here, the child did state, penis, and then went right into a reference to father's penis.  [¶]  Looking at 1360, the child is under 12.  The child is describing acts that I think properly fit the realm of child abuse.  So then really, what we're talking about is reliability which is what we're all focused on here.  She does consistently refer to [defendant's] penis being in her mouth, and she did raise that issue first.  [¶]  She states things that I wouldn't [*sic*] a child would understand through that act. . . . [¶]  She knows of a sexual act that a child at the age of six should not know of and is able to describe it.  Described . . . what it tastes like which I wouldn't expect a child of that age to understand these things.  [¶]  . . . in the end, I believe overall, this fits the 1360 requirement.  There [are] signs of reliability here through the prompting, . . . and how she consistently describes the acts at issue."  Thus, the trial court found the entire video admissible.

B.      *Evidence Code Section 1360*

Hearsay evidence is evidence of "an out-of-court statement offered for the truth of its content."  (*People v. Sanchez* (2016) 63 Cal.4th 665, 674; accord, Evid. Code, § 1200, subd. (a).)  Hearsay evidence is generally inadmissible unless it falls under an exception.  (Evid. Code, § 1200, subd. (b).)  "Multiple hearsay, or hearsay-within-hearsay, is admissible only when each level of hearsay 'meets the requirements of an exception to the hearsay rule.' "  (*People v. Superior Court (Couthren)* (2019) 41 Cal.App.5th 1001, 1010, citing Evid. Code, § 1201.)

Evidence Code section 1360 "creates a limited exception to the hearsay rule in criminal prosecutions for a child's statements describing acts of child abuse or neglect, including statements describing sexual abuse."  (*People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1367, citing Evid. Code, § 1360.)  Such statements are admissible under Evidence Code section 1360 if:  (1) they are not otherwise admissible by statute or court rule; (2) the court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of

21

reliability; and (3) the child either testifies or is unavailable as a witness. (Evid. Code, § 1360, subd. (a).)

"We review a trial court's rulings on the admission and exclusion of evidence for abuse of discretion." (*People v. Chism* (2014) 58 Cal.4th 1266, 1291.) In doing so, " '[w]e presume that the court properly applied the law and acted within its discretion unless the appellant affirmatively shows otherwise.' " (*People v. Mataele* (2022) 13 Cal.5th 372, 414.)

Here, the video recording involves two levels of hearsay, including the video itself and child's statement to the social worker. Because defendant concedes the video is admissible under the prior inconsistent statement exception, we turn to child's statement to the social worker.

Defendant contends the trial court neglected to consider child's statement to social worker in deciding the admissibility of the forensic interview video. But he fails to carry his burden on appeal. Although the trial court made no specific mention of child's statement to the social worker, it stated it had reviewed the transcripts and the video. It also noted child described the taste of the hair, which occurred almost immediately after child recounted her statement to the social worker, when Ojakangas asked child for clarification. Absent affirmative showings to the contrary, we presume the trial court considered the admissibility of child's statement to the social worker. (*People v. Mataele, supra*, 13 Cal.5th at p. 414.)

Defendant contends Evidence Code section 1360 does not make the statement to the social worker admissible when the statement was previously and tentatively found inadmissible by the trial court under different hearsay exceptions. This contention lacks merit because for a hearsay statement to be admissible under section 1360, it cannot be "otherwise admissible by statute or court rule." (Evid. Code, § 1360, subd. (a)(1).)

## III

### *Sufficiency of the Evidence*

Defendant contends the evidence presented at trial was insufficient, under both the California Constitution and the due process clause of the Fourteenth Amendment, to support the findings that he intentionally engaged in oral copulation with a child and committed lewd act with a child by use of force. We disagree.

### A.    *Trial Evidence*

The video of the forensic interview, including child's recount of her statement to the social worker, was admitted into evidence and the jury was provided with a transcript of the interview. The jury was also provided with the parties' stipulation that Ojakangas interviewed one of child's siblings who denied any abuse by defendant.

The jury listened to the audio recording of the postpolygraph interview between Russell and defendant, where defendant admitted his penis had been in child's mouth.

The video of the non-suppressed portion of the second Ortega interrogation was also played to the jury. It showed defendant told Sergeant Ortega that child put his penis inside her mouth but denied grabbing child's head and putting his penis in her mouth.

During her trial testimony, child denied ever seeing defendant's penis. She remembered telling Ojakangas that defendant "had penis in my mouth," but she thought the conversation was a dream and she did not know whose penis it was. She also denied telling Ojakangas that defendant showered naked with her.

Girlfriend testified that in her four or five years of relationship with defendant, she never saw "any indication that [defendant] got a proclivity to any kind of . . . pedophilia or some unhealthy lust for young children." Instead, defendant would always lecture people who have a relationship with a much younger person that they "were messing with jailbait." Girlfriend never witnessed defendant having any inappropriate behavior towards children.

Sergeant Ortega testified that defendant told her he and girlfriend would lock the door when they engaged in oral sex, but the children were able to compromise the lock.

B.     *Standard of Review*

"In reviewing a challenge to the sufficiency of the evidence under the due process clause of the Fourteenth Amendment to the United States Constitution and/or the due process clause of article I, section 15 of the California Constitution, we review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could have found" the essential elements of the crime beyond a reasonable doubt.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1212; accord, *People v. Morales* (2020) 10 Cal.5th 76, 88.)  In so doing, "[w]e presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence."  (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

C.     *The Oral Copulation Counts*

Defendant contends insufficient evidence supports the verdict for the oral copulation counts because child stated she put defendant's penis in her mouth, and no other evidence at trial showed defendant intentionally put his penis in child's mouth.  We disagree.

"Any person 18 years of age or older who engages in oral copulation . . . with a child who is 10 years of age or younger is guilty of a felony."  (§ 288.7, subd. (b).)  "Oral copulation is defined as any contact, no matter how slight, between the mouth of one person and the sexual organ of another."  (*People v. Mendoza* (2015) 240 Cal.App.4th 72, 80.)

Oral copulation with a child 10 years of age or younger is a general intent crime.  (*People v. Mendoza, supra*, 240 Cal.App.4th at p. 80.)  The required mental state of a general intent crime entails only an intent to do the act that causes the harm and can be satisfied by showing the defendant intentionally engaged in the proscribed conduct.

24

(*People v. Atkins* (2001) 25 Cal.4th 76, 86; *People v. Alvarado* (2005) 125 Cal.App.4th 1179, 1188.)

Here, the forensic interview video shows child telling Ojakangas that defendant "put his hand on [her] head" as she put one hand on her head, that she shut her eyes, and that defendant "open [her] mouth like this" as she used the other hand to squeeze her mouth open. After that, child said she "put [defendant's] penis in [her] mouth." Ojakangas repeated child's statement for clarification. She put two hands on her own head and asked child if defendant "put his hand on [child's] head;" she also squeezed her own mouth open with one hand and asked child if defendant "went like this with [child's] mouth." Child responded: "Yeah. After I shut – after I shut my eyes." Ojakangas continued: "After you shut your eyes. And then he put his penis in your mouth?" Child confirmed. Based on the conversation and the hand gestures, a reasonable jury could have concluded that defendant engaged in the proscribed oral copulation by putting his hand on child's head, opening her mouth, and putting his penis in child's mouth.

Defendant contends that child never claimed he put his penis in her mouth; instead, she said she put defendant's penis in her mouth, which was consistent with his statements to Russell and Sergeant Ortega. But Ojakangas "carefully rephrased [child's] statements to make [defendant] the one who performed or instigated the act." Other than child's statements, defendant claims no trial evidence supported a finding of intent. Rather, in his view, other trial evidence demonstrated a lack of intent, showing the children were showered either together or in quick succession, the shower was done with the bathroom door open and girlfriend in close vicinity, the children were curious and may have observed girlfriend performing oral copulation on defendant by compromising the lock on a door, one of child's siblings denied any sexual abuse by defendant, and girlfriend testified she never witnessed defendant showing any inappropriate behavior towards children.

But our focus is on whether defendant has ever conducted the proscribed act of intentionally putting his penis in child's mouth as charged here. (*People v. Alvarado, supra*, 125 Cal.App.4th at p. 1188 [the intent element in a general intent crime may be satisfied by showing the defendant intentionally engaged in the proscribed conduct].) As stated above, even though child said she put defendant's penis in her mouth in her initial statement, the statement was accompanied by her hand gestures showing someone else putting a hand on her head and squeezing her mouth open. She also stated the penis was in her mouth after she closed her eyes, making it unlikely that she was the one who put the penis in. Thus, viewing the evidence in the light most favorable to the People and presuming in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence, we conclude child's conversation with Ojakangas, accompanied by the hand gestures, was sufficient to support the jury's finding that defendant intentionally put his penis in child's mouth in violation of section 288.7, subdivision (b).

D.      *The Forcible Lewd Act Count*

Defendant contends insufficient evidence supports the verdict for the forcible lewd act count because there was no evidence showing he used force to put his penis in child's mouth. We disagree.

A person violates section 288, subdivision (b) when he willfully commits any lewd or lascivious act upon or with the body of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person "by use of force." (§ 288, subds. (a), (b)(1).)

The force contemplated by section 288, subdivision (b)(1) is " 'physical force substantially different from or substantially in excess of that required for the lewd act.' " (*People v. Babcock* (1993) 14 Cal.App.4th 383, 385.) " '[A]cts of grabbing, holding and restraining that occur in conjunction with the lewd acts themselves' are sufficient to

26

support a finding that the lewd act was committed by means of force." (*People v. Morales* (2018) 29 Cal.App.5th 471, 480.)

Here, as stated above, child told Ojakangas that defendant put his hand on her head and gestured that her mouth was squeezed open before the penis was in her mouth. When Ojakangas repeated the statement to child using the same hand gestures, child confirmed that defendant used his hand to open her mouth and put his penis inside. Therefore, defendant's act of putting his hand on child's head and opening child's mouth was sufficient to support a finding of use of force.

IV

*Jury Instruction*

Defendant contends the trial court prejudicially erred in failing to instruct the jury on the union of act and intent for the oral copulation counts, violating the due process clause of the Fourteenth Amendment. We agree that the failure to instruct was erroneous but find the error harmless.

A.      *Additional Background*

The trial court instructed the jury on the intent requirement of all counts with CALCRIM No. 251: "The crimes charged in this case require[] proof of a union or joint operation of act [and] wrongful intent. For you to find the person guilty in the crimes in this case, that person must not only intentionally commit the prohibited act but must do so with a specific intent. The act and the specific intent required are explained in the instruction for that crime, which I'll get to shortly."

For the oral copulation counts, the trial court instructed the jury with CALCRIM No. 1128, which requires the People to prove: (1) defendant engaged in an act of oral copulation with child; (2) when defendant did so, child was 10 years of age or younger; and (3) at the time of the act, defendant was at least 18 years old. CALCRIM No. 1128 further defines "oral copulation" as "any contact, no matter how slight, between the mouth of one person and the sexual organ or anus of another person." But the trial court

27

did not instruct the jury with CALCRIM No. 250 on general intent as to these counts, which would have required the jury to find defendant intentionally did a prohibited act.

For the forcible lewd act count, the trial court instructed the jury with CALCRIM No. 1111, which requires the People to prove: (1) defendant willfully touched any part of child's body; (2) defendant used force in committing the act; (3) defendant committed the act with the intent of arousing, appealing to, or gratifying the lusts, passions, or sexual desires of himself or child; and (4) child was under the age of 14 years at the time of the act. The instruction also states: "Someone commits an act willfully when he or she does it willingly or on purpose. It is not required the [d]efendant intend to break the law, hurt someone else, or gain any advantage. Actually arousing, appealing to, or gratifying the lust, passions, or sexual desires of the perpetrator or the child is not required."

B.      Applicable Law

"The law imposes on a trial court the sua sponte duty to properly instruct the jury on the relevant law and, as such, requires the giving of a correct instruction regarding the intent necessary to commit the offense and the union between that intent and the defendant's act or conduct." (*People v. Alvarado, supra*, 125 Cal.App.4th at p. 1185.) Jury instructions relieving the state of the burden to prove beyond a reasonable doubt every element of the charged offense violate a defendant's due process rights. (*Carella v. California* (1989) 491 U.S. 263, 265.)

We review claims of instructional error de novo. (*People v. Southard* (2021) 62 Cal.App.5th 424, 433.) "Where the error is the omission of 'an element of [the] offense,' such as the requisite mental state, it 'is subject to harmless error analysis under [*Chapman v. California* (1967) 386 U.S. 18].' " (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1161.)

C.      Analysis

The People concede the trial court erred in failing to instruct the jury on the general intent of the oral copulation counts. We accept this concession because the trial

court had a sua sponte duty to instruct the jury on the intent element of defendant's charged offense. But as we explain below, this error was harmless beyond a reasonable doubt.

Before giving the crime-specific instructions, the trial court told the jury that it must find defendant "not only intentionally commit the prohibited act but must do so with a specific intent" for all crimes in this case. Although the trial court incorrectly told the jury that the crime-specific instructions contained the particular intent requirement, nothing in these instructions suggested to the jury that a finding of intent was not required. (See *People v. ZarateCastillo* (2016) 244 Cal.App.4th 1161, 1168.) Thus, while the trial court's omission in giving the general intent instruction was error, the trial court "did nothing to remove the mental state element from the jury's consideration or relieve the prosecution of its burden of proof." (*People v. Jo, supra*, 15 Cal.App.5th, at p. 1161.) This is distinguishable from *People v. Jeffers* (1996) 41 Cal.App.4th 917, cited by defendant, where the trial court completely omitted instructing the jury on intent. (*Jeffers,* at p. 923.) Thus, the trial court's instructional error was harmless beyond a reasonable doubt.

V

*Sentencing*

Defendant contends the trial court abused its discretion in imposing consecutive terms on each count and a remand for resentencing is required. The People concede. We agree with the parties.

A.    *Additional Background*

At sentencing, the trial court told defendant: "I'm going to walk through everything I considered right now so you understand where I got where I got." It then reviewed all nine factors regarding defendant's eligibility of probation before denying defendant's request for probation. It also rejected the prosecutor's request for the upper term of 10 years on the forcible lewd act count and adopted the low term of 5 years

29

recommended by probation based on the lack of aggravating factors and the fact that defendant had no criminal history. But the trial court adopted probation's 60-years-to-life recommendation as to the oral copulation counts without providing any reasons.

*B.    Analysis*

Section 288.7, subdivision (b) does not require the imposition of consecutive sentences for violation of the statute. It merely states that an offender "shall be punished by imprisonment in the state prison for a term of 15 years to life."

Both section 667.6, subdivision (d)(1) and section 269, subdivision (c) mandate consecutive sentences in certain sex offenses if the offenses involve separate victims or involve the same victim on separate occasions. But section 288.7, subdivision (b) is not among the enumerated offenses in either section 667.6, subdivision (e) or section 269, subdivision (a). Thus, sections 667.6 and 269 do not apply to a violation of section 288.7, subdivision (b).

Absent an express statutory provision to the contrary, the decision to impose consecutive or concurrent terms is left to the sentencing court's discretion under section 669. (*People v. Valdez* (2011) 193 Cal.App.4th 1515, 1524; *People v. Woodworth* (2016) 245 Cal.App.4th 1473, 1479.) "Generally, when the record shows that the trial court proceeded with sentencing on the erroneous assumption it lacked discretion, remand is necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing." (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.)

Here, the trial court told defendant that it would go through everything so defendant could understand its decision. It then explained in detail the reasons for denying probation and imposing the low term on the forcible lewd act count. But the trial court inexplicably failed to explain why it imposed the 15-year-to-life terms on the oral copulation counts consecutively, or why the 5-year determinate term should be served consecutively with the indeterminate terms. Under these circumstances, we accept the

30

People's concession. (See *People v. Robinson* (1992) 11 Cal.App.4th 609, 614 [declining to imply the trial court reached a conclusion unfavorable to defendant when the record does not reflect it considered the issue of consecutive sentences], overruled on another ground by *People v. Scott* (1994) 9 Cal.4th 331, 353, fn. 16.)

## DISPOSITION

The matter is remanded for the limited purpose of a full resentencing as to all counts. On remand, the trial court shall exercise its discretion in deciding whether the sentence on each count should run concurrently or consecutively. The judgment is affirmed in all other respects.


                              /s/ 
                              MESIWALA, J.


We concur:


 /s/ 
EARL, P. J.


 /s/ 
MAURO, J.